UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOATHOUSE GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> TIGERLOGIC CORPORATION, <br><br> Defendant. | Civil Action No.  1:10–CV–12125–NMG |

**DECLARATION OF RICHARD KOE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Richard Koe, declare as follows:

1.     I have personal knowledge of the facts stated herein and, if called upon to testify, could and would testify competently to those facts.

2.     I am the President and CEO of TigerLogic Corporation ("TigerLogic").

3.     I live in Portland, Oregon.

4.     In December 2010, we purchased the POSTPOST name and mark, together with the substantial goodwill associated with it, from DK New Media LLC ("DK New Media").  DK New Media developed substantial goodwill and customer recognition in POSTPOST.  A copy of this Trademark Assignment is attached as Exhibit __.

5.     TigerLogic is a software company based in Irvine, CA, that designs, develops, sells and supports a variety of data management products.  These products allow our customers to create and enhance flexible software applications for their own needs.  Our software product lines include data management and software application tools.  Since our incorporation in 1987, TigerLogic has grown to about 100 employees.

6.     As part of our social media strategy, we developed POSTPOST, a real-time

personal social newspaper starting in June 2010.  It is TigerLogic's first social media production.

7. As a social newspaper, POSTPOST compiles all the links, pictures, and videos that people post on Facebook and presents them to POSTPOST's users as a real-time social newspaper.  In this way, our POSTPOST users learn what is interesting to their friends, from their friends.  While POSTPOST is loading, it presents a user with the message:  "see what your friends think that you should read in less than 30 seconds."

8. A screenshot showing a typical user's POSTPOST page is shown below:



As this screenshot shows, POSTPOST enables users to skim relevant passages of text shared by their Facebook friends quickly and to sort shared content by type using the "All," "Links,"

"Videos," "and "Pictures" control buttons at the top of the screen.  TigerLogic presents its mark in distinct three-dimensional newspaper-style blue lettering.  To access POSTPOST, users simply login using their Facebook account, and in a matter of seconds, all shared links, pictures, videos, articles from their Facebook friends populate the front page of their personal social newspaper.  In contrast, the postpo.st website is nothing more than a search engine, as shown by the screenshot below:



9. Whereas Facebook's "stream" of user posts can quickly become cluttered and unmanageable, our POSTPOST social newspaper offers a more intuitive layout that shows only the content shared by users' friends.  Users can also comment on, "like" and re-share content

directly from POSTPOST. POSTPOST allows users to add media to various types of social posts and entries.

10. As social media is comprised of "posts" and as newspapers are frequently named the "_____ Post," it was only natural that we gave our product, which is a newspaper consisting of people's posts, the descriptive name "POSTPOST."

11. At the time that we named and developed our product, we were unaware of Boathouse's claim to POSTPOST. The Boathouse Group had made no trademark filings that would have provided notice of its claim to rights in POSTPOST and, with its West African .ST domain name, it is not easy to find Boathouse's postpo.st website. Indeed, in performing Internet searching for POSTPOST to identify any prior users, Boathouse's postpo.st did not appear in any of our searches. Among other things, in October 2010, I searched Google for POSTPOST and Boathouse's postpo.st did not appear in any of the first several pages of the results (assuming that it appeared at all) and so I did not search beyond the first several pages. Among other things, this evidences not only that postpo.st was essentially unknown on the Internet but also that Boathouse chose not to purchase any web search ads or key words from Google or other Internet search engines. Thus, we had no reason to believe that Boathouse had any claim to POSTPOST. Furthermore, there are no press releases or other evidence that Boathouse launched its product publicly in a manner that would give notice of Boathouse's claim to POSTPOST. Boathouse waited until after TigerLogic's widely publicized launch of POSTPOST to file an application to register POSTPOST with the United States Patent and Trademark Office.

12. Boathouse allegedly established the @postposting Twitter feed sometime in August of 2010. The number of followers of a Twitter account is an indication of its popularity. As shown in Exhibit __, the @postposting Twitter today still has less than 200 followers, which is a small number, and should be contrasted with TigerLogic's @thepostpost's almost 1600 followers. In fact, using Boathouse's own Twitter search engine at postpo.st, it appears that as of November 29, 2010, followers of @postposting had only made 13 tweets that mention

POSTPOST.  As shown in Exhibits __, ___, and __, Brad Noble and Boathouse seized and exploited the goodwill associated with the publicity around TigerLogic's POSTPOST launch on December 7, 2010, to direct users to postpo.st, causing a dramatic increase of visitors to Boathouse's site.  This increase shows that Boathouse's POSTPOST was practically unknown prior to December 7th and visited by very few people.  The reason for the spike on December 7th was not because of confusion but simply because Brad Noble took advantage of TigerLogic's publicity to advertise Boathouse's existence for the first time.  Aside from sporadic comments by Brad Noble in connection with articles about TigerLogic's POSTPOST claiming confusion, there is no evidence on the amount of promotion made to the public and there is no evidence that any of our social media consumers identify the Boathouse Group's POSTPOST Twitter search product with Boathouse.  This is confirmed by the web analytics data attached as Exhibit ____, which shows that 60% of Boathouse's users originate outside of the United States.

      13.     Boathouse's POSTPOST does not even appear to be a fully released product, as it may still be a limited beta test product.  Exhibit ___ shows that the postpo.st website is still, in February 2011, only available as beta software and, therefore, may only have been available to a handful of beta testers during the time leading up to TigerLogic's launch of POSTPOST.  This would explain the anonymity and complete absence of postpo.st from leading search engines.  It is unclear when, if ever, the website was intended to be launched and promoted to the general public.  Boathouse does not own postpost.com (relying instead on the obscure, West African .st top level domain), and Boathouse's postpo.st website appears to have been previously intended for the internal use by Boathouse's existing business advertising clients to determine the effectiveness of their on-line marketing campaigns and/or to provide product search capabilities to its clients.  Attached as Exhibit ____ is a copy of Brad Noble's "tweet" that refers to the Boathouse product as a beta product.  Attached as Exhibit _____ is a copy of a November 24, 2010 *BostInnovation* article downloaded from: http://bostinnovation.com/2010/11/24/postpost-lets-you-search-everyone-you-follow-puts-wom-influence-online-in-checkmate/?utm_source-twitter= that states that the Boathouse product is beta software and describing Boathouse's plans

to offer its postpo.st product to its "partners" for product search. It is unclear when, if ever, the Boathouse postpo.st website was actually opened to the general public.

14. That POSTPOST is a personalized social newspaper, as opposed to a search engine, is evidenced not only in the screenshot I presented above, but also in our promotion of POSTPOST. TigerLogic launched its POSTPOST social newspaper on December 7, 2010. As the attached December 7, 2010 press release shows, TigerLogic promotes POSTPOST as "a real-time personal social newspaper that collects and curates posts shared by your Facebook friends into a familiar easy-to-read tabloid layout." Exhibit __. Since December 7, 2010, TigerLogic has developed goodwill in its POSTPOST real-time personal social newspaper. In addition to promoting POSTPOST through blog postings, we have also advertised it on Facebook.

15. Since its release on December 7, 2010, there have been many reviews of POSTPOST by members of the social media community. A number of these are attached as Exhibit __. In each of these reviews, the reviewers discuss POSTPOST's usefulness and effectiveness as a social newspaper. None of these reviews discuss using POSTPOST to search in the way that Mr. Noble alleges.

16. Moreover, while several of these reviewers compare TigerLogic's POSTPOST to other products, such as Flipbook and paper.li, not one of them mentions Boathouse or its postpo.st product. This, of course, makes perfect sense as the products are designed to do different things for different users.

17. We first learned of Boathouse's claim to POSTPOST on the day that it launched its POSTPOST social newspaper when Brad Noble of Boathouse posted comments about Boathouse's postpo.st search engine in response to an online article praising TigerLogic's POSTPOST social newspaper, as shown in Exhibit B. Since these initial postings, Boathouse has continued to post comments aimed at creating or insinuating confusion and otherwise interfere with the good will associated with TigerLogic's POSTPOST in a transparent and bad faith attempt to manufacture confusion to support its claims in this lawsuit. For example, Exhibit _____ shows Brad Noble using the alias "postposting" posting a comment on Twitter claiming

that an article written about TigerLogic's POSTPOST is causing "a lot of confusion about POSTPOST." In fact, as shown in Exhibit ____, the only person confused is Brad Noble himself, who posted a comment in response to the article stating that he "is surprised no one has mentioned that PostPost isn't new," and asking the article's author to make a special mention of postpo.st in the article, which the author later did. The obvious explanation for why "no one has mentioned" postpo.st is that no one had heard of postpo.st until Brad Noble made the comment. This is evident from the fact that the mentioning of postpo.st in the article written about TigerLogic's POSTPOST caused unprecedented traffic on postpo.st resulting in technical problems as shown in Exhibit __. Thus, not only is Brad Noble fabricating confusion, Boathouse is also exploiting for its own gains TigerLogic's tireless efforts to promote its POSTPOST mark. While TigerLogic investigated Boathouse's claims, TigerLogic put up a disclaimer and set up a link on its postpost.com home page to redirect anyone looking for Boathouse to their West African postpo.st domain name. As seen in Exhibit ___, we directed hundreds of visitors to POSTPOST.

18. Website users are worth between $10 and $20 each.

19. TigerLogic conducted a search on January 29, 2011, of hundreds of comments on Twitter that mentioned POSTPOST and found only one indication of "confusion." Exhibit ____ shows that the only one claiming "confusion" about POSTPOST is Brad Noble himself. Likewise, TigerLogic found in searching through several days of comments on twitter.com leading up to February 7, 2011, that out of almost 500 comments mentioning "postpost," only *two* mentioned Boathouse's postpo.st. Keeping in mind that Boathouse's POSTPOST application is a Twitter product, the absence of any genuine mention or association of POSTPOST with Boathouse on twitter.com is dramatic and highly revealing. Exhibit ___ shows almost 500 comments on Twitter that mention "postpost" and all, except two, appear to associate POSTPOST with TigerLogic's Facebook newspaper.

20. Rather than being a social newspaper, the Boathouse Group's POSTPOST product is a search engine for the Twitter posts of others. It does not present any results, much

less a tabloid-like page of current content, unless and until a user makes a specific search request. And then, it only presents a set of results related to that search query, with many of these results not being current content but archived content. This is very different from our POSTPOST product's presentation of current postings from a user's friends.

21. Similarly, we would not have proceeded with our use of POSTPOST had the .com domain name not been available. In this regard, postpost.com was available for sale. Given that the asking price for postpost.com was only $3,000, we registered it. Surely, if the Boathouse Group had committed to and adopted POSTPOST as recently as October 2010, it would have paid this low purchase price, and obtained ownership of the domain name.

22. DK New Media's social media focus on developing blogs and blog strategies, including the integration of services such as Twitter, RSS, and Facebook into social media strategies naturally extends to and directly supports our POSTPOST product and strategy.

23. As DK New Media's POSTPOST product is so complimentary to TigerLogic's POSTPOST product, we asked DK New Media to continue supporting and developing its POSTPOST product. DK New Media's social media focus in developing blogs and blog strategies, including the integration of services such as Twitter, RSS, and Facebook, naturally extends to and directly supports TigerLogic's POSTPOST social newspaper. In connection with this, we have licensed the use of the POSTPOST name and mark to DK New Media in connection with the same computer software and computer and social networking services with which it had previously been using the POSTPOST name and mark. A copy of this Trademark License Agreement is attached as Exhibit ___. TigerLogic will monitor the ongoing quality of DK New Media's licensed product, and all use by DK New Media will inure to the benefit of TigerLogic.

24. In addition, we have entered into a Consulting Agreement with DK New Media to promote our POSTPOST products. As part of this, DK New Media will add additional new features to its POSTPOST product to enhance its ability to work with our POSTPOST product and other emerging social media products, like Twitter and Facebook. A copy of this Consulting

Agreement is attached as Exhibit ___.

25. In Brad Noble's Declaration in Support of Plaintiff's Motion for Preliminary Injunction, he prepared two specialized screenshots of both the Boathouse Group's product and our POSTPOST product in an effort to show that the two products look similar and/or perform the same functions. His declaration testimony and the screenshots that he has presented, however, are very misleading. In particular, while it may very well be possible for someone to perform searching and generate results as Mr. Noble says, this is not why (or how) people use this product. As I noted above, TigerLogic's POSTPOST is a social newspaper. Unlike Boathouse's product, it does not require any user searching to function. And, indeed, such searching is merely ancillary to the use of TigerLogic's social newspaper. A person seeking a social newspaper couldn't use Boathouse's postpo.st product because it is a search engine. Similarly, a person looking for a search engine would not use our social newspaper. These are simply different products designed to solve different problems.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___ day of February 2011, in Portland, Oregon.

                                                          _____
                                                          Richard Koe

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 14, 2011.

/s/ Todd S. Holbrook