United States District Court
District of Massachusetts

```
_____
                                )
BOATHOUSE GROUP, INC.,          )
        Plaintiff,              )
                                )
        v.                      )      Civil Action No.
                                )      10-12125-NMG
TIGERLOGIC CORPORATION,         )
        Defendant.              )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Plaintiff Boathouse Group, Inc. ("Boathouse") brings suit against TigerLogic Corporation ("TigerLogic") for trademark infringement in the use of the mark POSTPOST, seeking injunctive relief and damages under the Lanham Act, 15 U.S.C. § 1125(a) ("Lanham Act") (Count I) and Massachusetts common law (Count II).

**I.   Background**

**A.   Factual Background**

Boathouse is an independent advertising agency incorporated in Delaware with its principal place of business in Waltham, Massachusetts.  Plaintiff developed "a social media search and curation application" called POSTPOST which it launched at the website http://www.postpo.st in August, 2010.  Plaintiff's application allows a user to conduct keyword searches of historical content stored on Twitter, Flickr and RSS and then to create a subset of those results to post to the user's profile

-1-

page for display.  That display can be edited and individual posts can be deleted.  Unlike a traditional search engine, plaintiff's application only searches the content of a user's social circle.  Boathouse asserts that from the beginning of its product development, it planned to expand the application to Facebook which it estimates will occur in approximately three months.

TigerLogic is a software company incorporated in Delaware with its principal place of business in Irvine, California.  In December, 2010, defendant launched an application called POSTPOST at the website http://www.postpost.com.  Defendant describes its application as a "real-time personal social newspaper" which compiles links, pictures and videos posted on Facebook and presents them to users in newspaper format.  Plaintiff, however, describes defendant's application as "a social media search and curation application" which performs the same functionality as plaintiff's application, including the ability to conduct keyword searches, except that defendant's application is on Facebook. TigerLogic apparently plans to expand its application to Twitter.

TigerLogic claims to be the senior user of the mark POSTPOST because it is the successor-in-interest of DK New Media ("DKNM") which has used the mark "in connection with computer software and computer and social networking services" since February, 2007. In December, 2010, after Boathouse had filed this suit, DKNM

agreed to assign the mark to TigerLogic and TigerLogic agreed to license the mark back to DKNM.  TigerLogic describes DKNM's product as a "social media tool" that allows bloggers and other social media "to customize and add content to their posts, webpages and RSS feeds."  Plaintiff contends the product is a "plugin" or an "optional formatting tool" on the WordPress blog platform that enables a blogger to append a preface or footnote to a blog entry so the text appears in a certain location on the computer screen.  Plaintiff states that DKNM's product does not search for content and "ha[s] nothing to do with" Twitter, Flickr, RSS or Facebook.

The Complaint alleges that defendant's actions constitute trademark infringement because defendant uses the same mark for an identical product, creating a high likelihood of consumer confusion as shown, in part, by actual confusion.  Plaintiff therefore seeks injunctive relief, including a preliminary injunction, and damages pursuant to the Lanham Act and Massachusetts common law.

Defendant's counterclaims allege: 1) that TigerLogic is the owner, by assignment from DKNM, of the POSTPOST mark which DKNM has used since February, 2007, 2) that because it is the senior user by virtue of its predecessor-in-interest's use, Boathouse has committed trademark infringement in violation of the Lanham Act (Counterclaim I) and Massachusetts common law (Counterclaim

III), and 3) injury to business reputation and dilution under Mass. Gen. Laws ch. 110H (Counterclaim II) and common law unfair competition (Counterclaim IV).

**B.    Procedural History**

On December 9, 2010, plaintiff filed suit against defendant for two counts of trademark infringement.  Six weeks later, on January 18, 2011, plaintiff moved for a preliminary injunction. Plaintiff contends that it delayed filing that motion because it was engaged in settlement negotiations with defendant which ended abruptly when defendant notified plaintiff it had entered the assignment agreement with DKNM.

Defendant was served on January 20, 2011 and moved on January 26, 2011 for expedited discovery which plaintiff promptly opposed.  On February 1, 2011, the parties agreed that defendant's opposition to the preliminary injunction motion would be due February 14, 2011.  On that date, defendant filed its opposition (and a corrected version the following day), as well as a motion for leave to file an over-long brief.  It also filed an answer asserting counterclaims against Boathouse.  On February 17, 2011, Boathouse moved for leave to file a reply and the reply itself.

## II.   **Motion for Preliminary Injunction**

### A.   **Standard of Review**

To obtain preliminary injunctive relief under Fed. R. Civ.

P. 65, a movant must demonstrate:

> (1) a substantial likelihood of success on the merits,
> (2) a significant risk of irreparable harm if the
> injunction is withheld, (3) a favorable balance of
> hardships and (4) a fit (or lack of friction) between
> the injunction and the public interest.

Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)

(citation omitted).  Likelihood of success on the merits is the

critical factor in the analysis and, accordingly, a strong

likelihood of success may overcome a "somewhat less" showing of

another element.  See Weaver v. Henderson, 984 F.2d 11, 12 (1st

Cir. 1993) (citations omitted); E.E.O.C. v. Astra United States,

Inc., 94 F.3d 738 (1st Cir. 1996).

In trademark cases, the first factor plays an even greater

role because the resolution of the other three factors will

depend, in large part, on whether the plaintiff is likely to

succeed in establishing infringement.  Borinquen Biscuit Corp. v.

M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006).  This

focus on likelihood of success is consistent with the idea that,

"as a matter of public policy, trademarks should be protected

against infringing uses."  Id.

B.    Application

1.    Likelihood of Success on the Merits

Section 43(a) of the Lanham Act provides:

Any person who ... uses in commerce any word, term,
name, symbol, or device ... which ... is likely to
cause confusion, or to cause mistake, or to deceive as
to the affiliation, connection, or association of such
person with another person ... shall be liable in a
civil action by any person who believes that he or she
is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  To prevail on a claim of trademark

infringement, the plaintiff must demonstrate that 1) it owns a

valid, legally protectable mark and 2) the defendant's use of

that mark will likely result in consumer confusion.  Star Fin.

Servs., Inc. v. AASTAR Mortg. Corp., 89 F.3d 5, 9 (1st Cir.

1996).[1]  Both registered and unregistered trademarks are eligible

for protection against infringing uses.  Borinquen, 443 F.3d at

117; see 15 U.S.C. §§ 1114, 1125.

a.    Ownership of the POSTPOST mark

Because the parties do not raise the issue of whether the

POSTPOST mark is protectable, the Court assumes for the purpose

of this motion that it is.

The crux of the dispute is over the ownership of the mark as

it relates to priority of use.  A party can establish ownership

---

[1] Because the elements of trademark infringement under Massachusetts law
and the Lanham Act are "essentially the same", Leejay v. Bed Bath & Beyond,
Inc., 942 F. Supp. 699, 701 n.2 (D. Mass. 1996), the Court's analysis of Count
I also applies to Count II.

-6-

of an unregistered mark based on priority of use of the mark in connection with a certain line of business.[2] <u>Volkswagenwerk Aktiengesellschaft</u> v. <u>Wheeler</u>, 814 F.2d 812, 815 (1st Cir. 1987). The determination of ownership in this case is complicated by TigerLogic's purported acquisition by assignment of the mark from (and its subsequent license-back to) a third party, DKNM, after Boathouse had already filed suit.

Setting aside the issue of DKNM's assignment for the moment, it is clear that Boathouse has priority based on the chronology of events with respect to TigerLogic itself.  Boathouse began using the mark no later than August, 2010, whereas TigerLogic began using the mark no earlier than December, 2010.  Thus, at the time Boathouse filed suit, Boathouse was indisputably the senior user and therefore owner of the mark.  If the assignment from DKNM is invalid, for whatever reason, Boathouse remains the senior user based on the priority between the parties.

TigerLogic raises the issue, however, of whether Boathouse has established sufficient "use" for the purpose of seniority.  Neither party charges a fee for its product.  As a result, absent actual sales of the product, "use" may be found where the pre-sale marketing is "sufficiently extensive" or a "test-market use" can be established.  See <u>CCBN.com</u> v. <u>C-Call.com</u>, 73 F. Supp. 2d

---

[2] Boathouse appears to have registered the POSTPOST mark on or after the day TigerLogic introduced its product.  Because Boathouse does not argue that it is entitled to any presumptions based on registration, the Court treats the mark as unregistered for the purpose of this motion.

106, 110 (D. Mass. 1999).  The party may show "use" by providing evidence demonstrating: 1) adoption and 2) use in a way "sufficiently public" to identify or distinguish the marked good in an appropriate segment of the public mind as those of the adopter of the mark.  Id. (citing New England Duplicating Co. v. Mendes, 190 F.2d 415, 418 (1st Cir. 1951)).

TigerLogic argues that 1) Boathouse's product is "nearly impossible to find", 2) Boathouse may not have used the mark in a "sufficiently public" way, and 3) Boathouse's product "appears to have been initially used for the internal use of Boathouse's existing business advertising clients."[3]

Although Boathouse appears to have had more modest success than TigerLogic so far, that does not mean that it cannot establish sufficient "use" for the purpose of determining seniority.  Boathouse introduced the POSTPOST mark in May, 2010, on a Twitter feed at which time it posted updates and other information regarding the development of its application.  In August, 2010, it launched its application in a "trial phase" (referred to by defendant as a "beta" version) on the website http://www.postpo.st.[4]  Boathouse states it has continued working

---

[3] TigerLogic makes a mountain out of a molehill by dwelling on plaintiff's choice of an ".st" address rather than the more popular ".com". Plaintiff explains that the ".com" address was owned by a third party who demanded $35,000, although defendant apparently paid just $3,000.

[4] It is unclear what "beta" means with respect to any limitations on Boathouse's application but the use of the term itself is unhelpful.

on its product and publicizing it on Twitter and various
websites, purportedly resulting in over 800 registered users.
The factors taken together suggest that plaintiff's use was
"sufficiently public" to establish "use" in the trademark sense.

Having determined that Boathouse would be the senior user
but for DKNM's assignment to TigerLogic, the Court turns to the
issue of whether TigerLogic's post-suit acquisition by assignment
and license-back of DKNM's mark is sufficient to afford it
priority of use with respect to Boathouse.  DKNM's use of the
mark dates from 2007.  Thus, with respect to the timeline,
TigerLogic (as DKNM's assignee) would succeed to DKNM's priority
of use and thus become the senior user with respect to Boathouse.

As an initial matter, however, the Court is doubtful that
the assignment and license-back arrangement in this case is
valid.  On the record before the Court, DKNM and TigerLogic
appear to have entered into the Trademark License Agreement on
December 28, 2010, whereas the Trademark Assignment Agreement is
dated December 29, 2010.  That TigerLogic could have licensed a
product that it did not yet own by assignment is incongruous.
Furthermore, defendant's submission of the Assignment is undated.
Nevertheless, the assignment may still be valid because the
temporal problem appears only to invalidate the license.

To be valid, an assignment of a trademark must include an
assignment of the goodwill associated with the mark and an

-9-

assignment in gross is invalid.  Visa, U.S.A., Inc. v. Birmingham
Trust Nat'l Bank, 696 F.2d 1371, 1375 (Fed. Cir. 1982).  The
doctrine protects the consumer from being misled or confused as
to the source of the goods or services he acquires and prohibits
transfers that could lead to a fraud on the public.  Id.  After
an assignment, the parties may license-back the mark "to enable
the assignor-licensee to continue to conduct the same business or
provide the same services under the mark."  Id. at 1376-77.  To
be a valid license, the licensor must adequately control the
quality of the goods and services provided by the licensee under
the mark.  Id. at 1377.

     Although assignment/license-back arrangements have been
upheld, they appear to occur most often in cases in which the
arrangement is between the two parties to the suit or the
arrangement with a third party preceded the suit.  The
arrangement here is neither.  Rather, it constitutes an obvious
attempt by defendant not only to evade liability for conduct that
likely constituted infringement at the time this suit was filed,
but also to transform the suit into one focused on plaintiff's
purported infringement of defendant's mark which only
materialized, if at all, after the assignment.  However, at least
one court has found that "an assignment motivated at least in
part by sound business judgment should [not] be set aside as a

sham transaction." <u>Money Store</u> v. <u>Harriscorp Finance, Inc.</u>, 689 F.3d 666, 678 (8th Cir. 1982).

Written documents purporting to comply with the requirements for an assignment and/or a license are ineffective unless the parties also comply with those requirements in practice (e.g. exercise actual, rather than hypothetical, control over the licensee).  <u>See, e.g.</u>, <u>Rey</u> v. <u>Lafferty</u>, 990 F.2d 1379, 1393 n.10 (1st Cir. 1993) (noting trademark protection may be lost if licensor fails to control quality of the goods); <u>see also</u> 3 McCarthy, <u>Trademarks and Unfair Competition</u> §§ 18:42, 18:58 (4th ed.) (listing cases).  The assignment agreement here appears, at least on its face, to comply with that requirement but it is difficult, on the current record, to determine whether the arrangement should be invalidated as a sham, as plaintiff urges.

Nevertheless, because the arrangement raises issues that cannot be determined on the record before the Court, the Court assumes for the moment that the transaction validly conveyed any rights DKNM had in the mark to TigerLogic.[5]  The Court must then determine whether that assignment was effective for the purpose of transferring seniority (i.e. whether TigerLogic succeeds to DKNM's status as the senior user with respect to Boathouse).  Boathouse argues that the assignment fails to transfer priority

---

[5] For that same reason, the Court declines to address plaintiff's contention that DKNM abandoned the mark due to non-use and thus had no rights to assign.

because DKNM's product is "completely unrelated" to TigerLogic's product.

Trademark protection may extend beyond the exact product to include related products or services. Boston Athletic Assoc. v. Sullivan, 867 F.2d 22, 28 (1st Cir. 1989); see also Perfection Fence Corp. v. Fiber Composites LLC, 2005 WL 353017, *3 (D. Mass. Feb. 10, 2005) (fencing and decking products related); Best Flavors, Inc. v. Mystic River Brewing Co., 886 F. Supp. 908, 912 (D. Me. 1995) (root beer and coffee cola, but not alcoholic beverages, related to nonalcoholic carbonated beverages). However, a substantial change in the nature or quality of goods sold under a mark, regardless of whether there is an assignment, may change the nature of the good will symbolized by the mark to the extent that rights in the mark are lost. See 3 McCarthy § 18:27; see also PepsiCo, Inc. v. Grapette Co., 416 F.2d 285 (8th Cir. 1969). Courts use various terms and concepts to refer to this loss of rights, such as abandonment, relatedness of products, or, in the case of an assignment, invalidity or ineffectiveness.

A valid assignment requires that the products or services be sufficiently similar to prevent consumers of the products or services offered under the mark from being "misled from established associations with the mark." See Visa, 696 F.2d at 1376. Minor or expected variations or alterations in the quality

or characteristics of the product will not invalidate the
assignment.  See, e.g., Bambu Sales, Inc. v. Sultana Crackers,
Inc., 683 F. Supp. 899 (E.D.N.Y. 1988) (thinner cigarette paper);
Glamorene Products Corp. v. Procter & Gamble Co., 538 F.2d 894
(C.C.P.A. 1976) (changed formulation of dry cleaning detergent);
Hy-Cross Hatchery, Inc. v. Osborne, 303 F.2d 947 (C.C.P.A. 1962)
(different varieties of chicken).

     By contrast, an assignment is ineffective to transfer the
assignor's priority if the assignee uses the mark on
substantially different goods or services.  PepsiCo, Inc. v.
Grapette Co., 416 F.2d 285 (8th Cir. 1969) (acquisition of mark
on cola drink did not confer priority when assignee used mark on
pepper drink); see also Sugar Busters LLC v. Brennan, 177 F.3d
258 (5th Cir. 1999) (retail store specializing in products for
diabetics compared to title of health and weight loss book
recommending reduced consumption of insulin-producing foods);
Clark & Freeman Corp. v. Heartland Co., 811 F. Supp. 137
(S.D.N.Y. 1993) (women's boots and men's shoes).  Use of the mark
by the assignee "in connection with a different goodwill and
different product would result in a fraud on the purchasing
public who reasonably assume that the mark signifies the same
thing, whether used by one person or another."  Marshak v. Green,
746 F.2d 927, 929 (2d Cir. 1984).

Defendant asserts, without specifics, that the DKNM and TigerLogic products are related because the DKNM product might be expanded in the future and is "so complimentary" to TigerLogic's product.  Such assertions fail to demonstrate that the two products are, in fact, related.

Here, although DKNM's plugin and TigerLogic's application share some general and broadly-construed similarities (e.g. both are used on the internet), they seem otherwise unrelated with different purposes, thus making the assignment ineffective for the purpose of transferring priority.  DKNM's plugin is an optional feature designed to work with specific software.  It has limited functionality, requires the user to input content and lacks a search feature.  Furthermore, it does not rely on or require access to a user's social network to function, unlike the applications of TigerLogic and Boathouse.

By contrast, TigerLogic's application is premised on access to information generated by a user's social network and has the ability to aggregate that information or allow the user to search, edit and delete content.  While DKNM's plugin is a feature of the WordPress platform, TigerLogic's product is an application itself.  Cf. Realnetworks, Inc. v. QSA Toolworks, LLC, 2009 WL 2512407, *6 (W.D. Wash. Aug. 14, 2009) (comparing streaming media application and relational database management application and finding distinct fundamental functionality).

-14-

DKNM's plugin and TigerLogic's product are substantially different such that TigerLogic's use of DKNM's mark in connection with TigerLogic's application (instead of DKNM's plugin) may result in fraud on the public and consumer confusion.  See Marshak, 746 at 929.

Moreover, the fact that both products are used on the internet (or even, as defendant argues, used in connection "with computer software and computer and social networking services") is not specific enough to consider them substantially related products.  Indeed, the generic rubric of "internet-related services" has been considered too broad in determining the relatedness of two products or services. See Instant Media, Inc. v. Microsoft Corp., 2007 WL 2318948, at *10 (N.D. Cal. Aug. 13, 2007).  Defendant's "computer software" classification is even broader than "internet-related services", encompassing products that could be used without the internet at all (e.g. Microsoft Word).  The so-called "computer and social networking services" rubric is no more convincing, appearing at the same time to be both broader (i.e. including computer services that could be both related and unrelated to the internet) and narrower (i.e. including social networking services that are presumably a subset of the computer services) than "internet-related services".

In sum, because the assignment fails to transfer priority from DKNM to TigerLogic, Boathouse is the senior user and thereby owner of the POSTPOST mark with respect to TigerLogic.

### b.    Likelihood of Confusion

The key element in the infringement analysis is the likelihood of confusion.  In making that assessment, the Court considers eight factors: 1) similarity of the marks, 2) similarity of the services, 3) relationship between the parties' channels of trade, 4) relationship between the parties' advertising, 5) classes of prospective purchasers, 6) evidence of actual confusion, 7) defendant's intent in adopting its mark and 8) strength of the plaintiff's mark. Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981).  The burden is substantial: a plaintiff alleging trademark infringement must show more than a mere "possibility of confusion" but rather a "substantial likelihood of confusion." Bear Republic Brewing Co. v. Cent. City Brewing Co., 2010 WL 2330411, at *5 (D. Mass. June 7, 2010).

### i.    Similarity of Marks

When assessing the similarity of two marks, the Court should consider the "sight, sound and meaning" of the marks. Boustany v. Boston Dental Group. Inc., 42 F. Supp. 2d 100, 107 (D. Mass. 1999).  The determination should be a holistic one, taking into

account the "total effect" of each mark, rather than comparing

their "individual features."  Id.; Pignons, 657 F.2d at 487.

     Here, the marks are remarkably similar.  Indeed, both marks

contain the lettering "PostPost" and neither uses additional

letters or words.  To that extent the marks are identical rather

than merely similar.  Although the logos are different colors

(red for Boathouse, blue for TigerLogic), both appear to use

either "PostPost" or "PP".  Moreover, both marks refer to

applications that enable a user to search, compile and edit

information generated by online social contacts.  Thus, this

factor weighs strongly in plaintiff's favor.

### ii.  Similarity of the Services

     The parties apparently agree that the products are both

social media applications but there is profound discord regarding

the specific characterization of each product and relevant

analogies for them.

     Both applications allow the user to search information

generated by his or her online social contacts and to read,

compile, edit or post that information.  Both products work on

widely-used social networks (Twitter for Boathouse, Facebook for

TigerLogic).  TigerLogic's product, however, automatically

aggregates and generates a "social newspaper", whereas

Boathouse's product requires the user to input a keyword search.

(A user of TigerLogic's product can, however, also input keywords

for searches.)  The parties disagree on the importance of the additional functionality and whether the search function of TigerLogic's application is merely ancillary.  Given the similarity of the search and curation functions, however, together with the fact that both products are designed to work based solely on a user's social network, the similarity of the services weighs in Boathouse's favor.

### iii. Similarity of Advertising, Channels of Trade and Prospective Customers

Similarities of advertising, channels of trade and prospective customers are generally considered together.  <u>See</u> <u>Pignons</u>, 657 F.2d 482, 488 (1st Cir. 1981).

Both Boathouse and TigerLogic have Twitter feeds associated with the POSTPOST mark that appear to be used to publicize their respective applications.  In addition, each party makes its application available via a website bearing the POSTPOST mark (http://www.postpo.st for Boathouse, http://www.postpost.com for TigerLogic).  Moreover, the applications both function with social media platforms (Twitter for Boathouse, Facebook for TigerLogic).  The commonality of the prospective users is less certain.  The extent and aim of Boathouse's publicity and marketing is unclear but each party has stated an intention to expand its product to the opposing party's current platform. Given the other similarities, this factor also leans in plaintiff's favor.

-18-

### iv.  Evidence of Actual Confusion

Evidence of actual confusion is often the "best possible evidence" of future confusion.  Borinquen, 443 F.3d at 120. Where the products have only coexisted in the market for a short period of time, lack of actual confusion is less salient, and in any event, actual confusion is "not indispensable to a finding of likelihood of confusion."  See id. at 121 (two years of product coexistence is not long enough to expect actual confusion); TriMark USA, Inc. v. Performance Food Grp., LLC, 667 F. Supp. 2d 155, 167 (D. Mass. 2009) (lack of evidence of consumer confusion irrelevant where logos had only coexisted for several months). Where actual confusion has occurred, however, it "is such persuasive evidence of the likelihood of confusion that even a minimal demonstration of actual confusion may be significant." Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 45 (D. Mass. 1995) (citing Boston Athletic Assoc. v. Sullivan, 867 F.2d 22, 31 (1st Cir. 1989)).

Given that the products have only coexisted in the market for a short period of time, an absence of actual confusion would not be unexpected.  Boathouse has, however, provided evidence of several instances of actual confusion in posts on Twitter and other websites.  Because actual confusion is persuasive evidence of future confusion, this factor weighs in favor of plaintiff.

                    **v.   Defendant's Intent in Adopting Mark**

     Although Boathouse alleges that TigerLogic's intent is
suspect, TigerLogic responds that it had no knowledge of
Boathouse or its application prior to adopting its mark.  At this
point, no discovery has been conducted and no evidence has been
presented indicating any bad faith or intent on the part of
TigerLogic.  Thus, this factor is neutral.

                    **vi.   Strength of the Marks**

     In evaluating the strength of the marks, the Court considers
factors such as the length of time the mark has been used, its
relative renown and plaintiff's vigilance in promoting its mark.
See Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1,
16 n.14 (1st Cir. 2008); see also Attrezzi, LLC v. Maytag Corp.,
436 F.3d 32, 40 (1st Cir. 2006)

     Boathouse argues that POSTPOST is a strong, distinctive mark
that is "fanciful" because it is a made-up word.  Whether a word
is "fanciful" goes to its legal classification and conceptual,
rather than commercial, strength.  See id. Boathouse has used
the mark for less than one year and evidence regarding the extent
of its efforts at publicity is unclear.  As a result, this factor
is neutral or weighs slightly in TigerLogic's favor.

     In sum, the Pignons factors, particularly the similarity of
marks, services, channels of advertising, trade and prospective

                              -20-

customers, as well as evidence of actual confusion, weigh in favor of finding a substantial likelihood of confusion.

### 2.   Irreparable Harm

In the context of trademark litigation, irreparable harm is generally presumed if a plaintiff demonstrates a likelihood of consumer confusion.  See Commerce Bank & Trust Co. v. TD Banknorth, Inc., 554 F. Supp. 2d 77, 87 (D. Mass. 2008).  Because there is a substantial likelihood of confusion, irreparable harm may be presumed and this prong weighs in favor of granting a preliminary injunction.

### 3.   Balance of the Equities

The balance of the equities appears to lean in Boathouse's favor.  Although the products have only coexisted for a short time, Boathouse already appears to be facing instances of actual confusion which may continue in the future.  As the senior user, Boathouse has offered its product longer and may suffer harm if it loses control over its reputation and goodwill.  Although TigerLogic has apparently experienced success in the short run since its product was introduced and requiring it to change its mark may cause some hardship, the balance weighs in favor of Boathouse.

### 4.   Public Interest

The public interest is served by preventing consumer confusion.  See Calamari Fisheries, Inc. v. The Village Catch,

Inc., 698 F. Supp. 994, 1015 (D. Mass. 1988).  Because there is a substantial likelihood of confusion, this prong weighs in favor of granting a preliminary injunction.

Thus, because Boathouse has shown a substantial likelihood of success on the merits, which weighs heavily in its favor in a case of trademark infringement, and the other prongs also weigh in its favor, the Court will allow the motion for preliminary injunction.

## IV.   **Motion to Expedite Discovery**

Defendant moves for expedited discovery on the grounds that it needs a reasonable opportunity for discovery to rebut plaintiff's motion for a preliminary injunction because many of the facts are accessible only to plaintiff.  Plaintiff responds that defendant's motion is an "attempted fishing expedition".  Because defendant fails to indicate what specific information it believes should be subject to discovery for the limited purpose of responding to plaintiff's pending motion, the Court will deny the defendant's motion, to the extent it is not already moot.

**ORDER**

In accordance with the foregoing,

1)    plaintiff's Motion for Preliminary Injunction (Docket
      No. 5) is **ALLOWED** as ordered in the separately-docketed
      **PRELIMINARY INJUNCTION** entered this date; and

2)    defendant's Motion to Expedite Discovery and to Extend
      Time to Oppose Plaintiff's Motion for Preliminary
      Injunction (Docket No. 9) is **DENIED.**

The parties are directed to submit a joint scheduling
statement on or before March 21, 2011, outlining an expedited
trial schedule and, if necessary, a scheduling conference will be
held on Monday, April 4, 2011, at 3:30 p.m.


**So ordered.**

                              /s/ Nathaniel M. Gorton
                             Nathaniel M. Gorton
                             United States District Judge

Dated March 7, 2011

-23-